**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02596-MSK-KLM

**PRIDE SERVICES, INC.**, a Colorado corporation,

      Plaintiff,

v.

**CITY AND COUNTY OF DENVER**, a municipal corporation;
**CALVIN BLACK**, in his official and individual capacities; and
**ONE OR MORE JOHN DOES**,

      Defendants.

---

**OPINION AND ORDER GRANTING MOTIONS TO DISMISS**

---

**THIS MATTER** comes before the Court pursuant to Defendant City and County of Denver's ("Denver") Motion to Dismiss **(# 13)**, the Plaintiff's response **(# 16)**, and Denver's reply **(# 18)**; and Defendant Black's Motion to Dismiss **(# 15)**, the Plaintiff's response **(# 17)**, and Mr. Black's reply **(# 25)**.

**FACTS**

According to the Complaint **(# 1)**, Plaintiff PRIDE Services, Inc. ("Pride") is "a white-owned and operated company" that provides cleaning services. In July 2007, Denver offered Pride the opportunity to perform certain pressure-washing services at Denver International Airport ("DIA"). Initially, the work was performed pursuant to a series of purchase orders, but Pride believed that the working arrangement would eventually be reduced to a contract that would last for several years. Pride also believed that it was being retained as an independent

1

contractor, and that it retained the right to direct and control its work, subject only to its obligation to produce a finished product as requested by Denver.

Defendant Black was designated by Denver to oversee Pride's work. Pride contends that Mr. Black, who is black, "harassed [its] employees" and "treat[ed] them as though they were his personal servants, micro-managing every detail of their work," thus creating "a hostile working environment for [Pride] and its employees." Among other things, Mr. Black "selected the specific pressure washing tasks [Pride] would complete," and "intentionally manipulated [Pride's] work schedule, frequently changing the work schedule without cause or notice". This conduct caused Pride to incur additional costs. Pride contends that it complained about Mr. Black's conduct to Denver officials, but no remedial action was taken.

On August 23, 2007, Pride notified the city that it was suspending its work at DIA, pending resolution of the issues involving Mr. Black and Denver's failure to reduce the parties' agreement to a multi-year contract. Pride states that it believed that Denver officials "were working on a resolution" of the issues, but in October 2007, Pride learned that Denver retained another company to perform pressure washing services. In 2008, Denver awarded a contract to a black-owned company that, Pride contends, "is far less qualified." Pride further contends that in 2010 and 2011, Denver and Mr. Black made false statements (to unidentified persons) impugning the quality of Pride's work.

Pride asserts two claims for relief: (i) Defendants violated the Equal Protection clause of the 14th Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1983, by engaging in racial discrimination against Pride, specifically by Mr. Black "harass[ing] Plaintiff's employees," "caus[ing] Plaintiff to lose money by manipulating the tasks and work schedule, by

"not allow[ing] Plaintiff to complete work under the purchase order," by "den[ying] Plaintiff an equal opportunity to receive the promised long-term pressure washing contract" and by Denver in failing to take remedial action against Mr. Black after Pride complained; and (ii) race discrimination, in violation of 42 U.S.C. § 1981, on essentially the same facts.

Denver moves **(# 13)** to dismiss all claims arguing that : (i) the claims are barred by the statute of limitations; and (ii) any timely claims (*i.e.* claims arising from statements made by Denver and Mr. Black in 2010 and 2011) fail to state a claim for relief. Mr. Black also moves **(#15)** to dismiss the claims against him, offering essentially the same arguments.

## ANALYSIS

### A. Statute of limitations

Although assertion of an applicable statute of limitation is an affirmative defense that must be raised by a defendant, the Court may assess the timeliness of an action on a Rule 12(b) motion if the dates in the Complaint make clear that the claims are untimely. *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980). In such circumstances, the burden is on the plaintiff to demonstrate a basis for tolling the statute of limitation. *Braxton v. Zavaras*, 614 F.3d 1156, 1159-60 (10th Cir. 2010).

1. Section 1983 claims

In Colorado, claims brought pursuant to 42 U.S.C. § 1983 are governed by a two-year statute of limitation. *Braxton*, 614 F.3d at 1160. Pride commenced this action on October 4, 2011, and thus, to be timely, its § 1983 claim(s) must have accrued no earlier than October 4, 2009. If it did not, the claim is barred unless Pride can demonstrate a basis for tolling the statute. A claim accrues, for § 1983 purposes, when a plaintiff "knows or should know that his or her

constitutional rights have been violated." *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998).

Pride's statement of the § 1983 claims encompasses numerous allegations, each of which might arguably constitute a separate constitutional violation, but the last identified event identified is the Defendants' award of a pressure-washing contract to a different entity in 2008. Nothing in the Complaint indicates that the award of that contract was somehow concealed from Pride or that other circumstances prevented Pride from obtaining timely knowledge of that award. Thus, the Court finds that Pride's § 1983 claims relating to the pressure-washing contract accrued, at the very latest, at some point in 2008. Because Pride's §1983 claims accrued prior to October 2009, they are untimely unless the statute is tolled. Pride offers no argument for tolling and thus, the Court finds that Pride's § 1983 claims are untimely.

2. Section 1981 claims

Compared to the relatively straightforward statute of limitations analysis for § 1983 claims, the timeliness for assertion of a § 1981 claim is subject to a more convoluted review process.[1] As initially enacted in 1866, § 1981 had two distinct features salient to the issues presented here: (i) it did not contain any express statute of limitations, and (ii) as interpreted by the Supreme Court, it prohibited racial[2] discrimination only in the "mak[ing] and enforce[ment]

---

[1] In the 10th Circuit, § 1981 claims against state actors (as opposed to private actors) are treated as arising under § 1983 instead. *Bolden v. City of Topeka*, 441 F.3d 1129, 1134-1137 (10th Cir. 2006). Arguably, the Court need not consider the complex statute of limitations issues applicable in § 1981 claims, and could instead find that Pride's nominal § 1981 claims are also untimely under § 1983's two-year statute of limitations as discussed above.

[2] The Court has some doubt that Pride, as a corporate entity, has a "race" that can be discriminated against. Nevertheless, courts have found corporate standing to bring § 1981 claims where a corporation suffered an injury as a result of discrimination based on the race of

4

of contracts," but did not create a extend for harassment or improper termination of contracts. *Jones v. R.R. Donnelly & Sons Co.,* 541 U.S. 369, 372-73 (2004), *citing Paterson v. McLean Credit Union*, 491 U.S. 164 (1989). In the 1980s, Congress enacted 28 U.S.C. § 1658, a statute that provides a catch-all 4 year statute of limitation for any act of Congress occurring after 1990. In addition, in 1991, Congress overturned *Patterson* as part of the Civil Rights Act of 1991. This broadened § 1981's reach to encompass racial discrimination in "the termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The net effect of these two enactments makes § 1981 claims that became cognizable by virtue of the 1991 amendment subject to a four-year statute of limitations, and §1981 claims that were cognizable before 1991 subject to the traditional practice of "borrowing" the most applicable state statute of limitations – in Colorado, a two-year limitations period. *Jones*, 541 U.S. at 382-83; *Cross v. The Home Depot*, 390 F.3d 1283, 1288 (10th Cir. 2004). Thus, it is necessary to ascertain which aspects of Pride's § 1981 claims arise by virtue of the 1991 amendments to § 1981, and which claims were cognizable under the original version of that statute.

As explained in *Patterson*, the original text of § 1981 prohibited racial discrimination in the "mak[ing]" and "enforce[ment]" of contracts. The former relates only to situations where "the refusal to enter into a contract" was based on discriminatory animus, but not to any post-formation issues. 491 U.S. at 176-77. The latter applies only to racially-motivated impediments

---

its employees. *Guides, Ltd. v. Yarmouth Group Property Mgt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002). The Court will assume, without necessarily finding, that such a rule also extends to Pride, who identifies itself in the Complaint as "white-owned."

that "prevent one from enforcing contract rights" through the legal process. *Id.* at 177-78.

Pride's § 1981 claims can be roughly grouped into two categories: (i) that the Defendants discriminatorily refused to enter into a long-term contract with it, instead requiring it to work via short-term purchase orders; and (ii) that Defendants interfered with Pride's operations under the terms of those purchase orders. The first category falls within *Patterson*'s interpretation of § 1981's original prohibition on discrimination in the "making" of contracts – in other words, Pride alleges that Denver either "refus[ed] to enter into a contract" or it "offered to make a contract only on discriminatory terms," that is, via short-term purchase orders instead of a long-term contract due to racial animus. 491 U.S. at 177-78. Because these issues of contract formation were cognizable under § 1981 as originally drafted, the claims are subject to Colorado's "borrowed" two-year limitations period, and thus are untimely for the same reasons discussed above with regard to the § 1983 claims.

Pride's second category of contention is that the Defendants interfered with its ability to perform the terms of its "contracts" – *i.e.* the purchase orders. This type of claim arises after the formation of the contracts (purchase orders), and therefore is cognizable only as a result of the 1991 expansion of § 1981. *Jones*, 541 U.S. at 383. Thus, these claims are be subject to § 1658's four-year limitations period. Assuming these claims arose between July and August 2007 – the period of time in which Pride was performing services at DIA – to be timely, they had to be asserted by August 2011, four years later. Because the Complaint in this action was not filed until October 2011, even Pride's post-formation § 1981 claims are thus untimely.

Pride appears to make a cursory argument that it did not discover the "cause" of its injuries – and thus, accrue the § 1981 claim – until some time in 2008, 2010, or even 2011. As

best the Court can determine, Pride is contending that although it may have been cognizant of the **existence** of Mr. Black's conduct in 2007, it did not know that such conduct was racially motivated until 2008, when Denver awarded the pressure-washing contract to a less-qualified black-owned firm. The Court finds such an argument unavailing.

The Complaint is somewhat unclear as to what circumstances led Pride to the epiphany that Mr. Black's conduct was racially-motivated. Pride was aware of Mr. Black's race, as Pride's employees apparently interacted personally with him during his "micro-mangaging" of them in 2007. To the extent that Pride intends to argue that adverse treatment by a black person such as Mr. Black, against a white-owned entity such as Pride, permits an inference that the treatment is racially-motivated, Pride was on notice of that fact as of 2007.

Perhaps Pride is contending that it was simply baffled as to why Mr. Black was treating it badly in 2007, and it was not until the 2008 award of the pressure-washing contract to a black-owned firm that the pieces clicked into place. Putting aside strong concerns that the Court might have as to whether Pride was obligated to promptly investigate the possible bases for Mr. Black's hostile treatment of it, the Court nevertheless notes that Pride cannot contend that it was completely ignorant in 2007 of the possibility of a racially-motivated explanation for Mr. Black's conduct. Indeed, the Complaint alleges that Pride obtained the opportunity to perform pressure-washing services at DIA only after Allstate Sweeping, another white-owned company, had its contract to perform such services terminated after sending "a letter to City officials complaining about being discriminated against by City employees, including Mr. Black." Nothing in the Complaint suggests that Pride was unaware of Allstate Sweeping's troubles with Mr. Black, nor of Allstate's concern that Mr. Black's treatment of it was racially-motivated.

Accordingly, the Court finds that the Complaint does not support an argument by Pride that it was actually and constructively unaware of the racially-motivated character of its injury until some point in 2008.

Accordingly, the Court finds that all of Pride's § 1981 claims relating to the Defendants' refusal to enter into a long-term contract with it and Mr. Black's interference in the performance of its short-term contracts are untimely under the relevant statutes of limitation.

### B.  Failure to state a claim

That leaves only Pride's claim that Denver and Mr. Black gave disparaging references about Pride to unidentified prospective customers in 2010 and 2011. Although Pride's Complaint makes no particular mention of the references in its articulation of this claim, *see e.g.* Docket # 1 at ¶ 45, 47, and its responses to the instant motions mention the references only in the most abstract sense, the Court nevertheless assumes that Pride bases this claim on § 1981 and §1983. Because these claims are, arguably, timely, the Court turns to the Defendants' second argument – that such allegations fail to state cognizable § 1981 and § 1983 claims.

### 1.  Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified what constitutes a "well-pleaded fact" for purposes of a Rule 12 analysis. A pleader is not required to set forth "detailed factual

allegations," but must offer more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S.Ct. at 1949. The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including "legal conclusion[s] couched as a factual allegation." *Id.* at 1949-50. Moreover, the facts pled must demonstrate a claim that is more than just an abstract "possibility" that the defendant has engaged in actionable misconduct. *Id.* One way in which the Court might conduct its analysis is to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and disregard them. Then, faced with only well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

2. <u>Analysis</u>

The Court's first task is to identify the theory of liability alleged in the claims of adverse references. Pride cites to two cases in support of its contention that the references are actionable because they "adversely affected [its] reputation and potentially affect[ed] its bonding capacity."

The first, *Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996), is inapposite, as *Berry* involved Title VII claim by a former employee who contended that the employer had initiated criminal fraud charges against the employee in retaliation for the employee having filed a charge of discrimination against the employer. The employer moved to dismiss the claim, arguing that Title VII does not extend protection to former (as opposed to current or recently terminated) employees and that the filing of criminal charges against a former employee does not constitute an "unlawful employment practice" under that statute. *Id.* at 984-85. In rejecting the

9

employer's argument, the 10th Circuit relied on its prior decision in *Rutheford v. American Bank of Commerce*, 565 F.2d 1162, 1165 (10th Cir. 1977), in which it held that a former employee could assert a retaliation claim against her former employer who gave adverse references about her to prospective employers. 74 F.3d at 985-86.

*Berry*, and by extension *Rutheford*, are inapplicable here for two reasons: first, those cases involved **claims by former employees under Title VII**. Here, Pride was not an employee of Denver or DIA; rather, according to its contentions, Pride was simply a contractor. Pride does not offer any argument as to why the rationale of *Berry* and *Rutheford* – which was premised on Title VII's "broad remedial goals" in protecting employees, 74 F.3d at 985 – should be extended to encompass the very different relationship that contracting parties occupy. Second, *Berry* and *Rutheford* involved claims of **retaliation**. Here, neither the Complaint nor Pride's responses to the Defendants' motions ever use the word "retaliation" in characterizing Pride's claims. Although retaliation claims are cognizable under § 1981 and 1983, *see e.g. CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451 (2008) (§ 1981 recognizes retaliation claims), *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 673-74 (1996) (retaliation for exercise of First Amendment rights under § 1983), the Court is reluctant to read such a discrete theory into Pride's Complaint where Pride has not attempted to do so.

The second case cited by Pride is also inapposite. In *Denny Const. v. City and County of Denver*, 199 P.3d 742, 743 (Colo. 1999), the question considered by the Colorado Supreme Court was "whether a construction contractor [in a breach of contract action] may recover lost profit damages from the breaching party that are attributable to impaired bonding capacity." As a case strictly considering the question of whether a certain claimed item of damages is

10

"speculative" as either an issue of law or fact, *Denny* is irrelevant to the question of how, if at all, Pride's claims regarding its references should be characterized.

This Court concludes that Pride's claim relating to its references are too ill-formed to permit meaningful analysis as to their sufficiency. It is not clear whether Pride is contending that the adverse references were given as retaliation for Pride's complaints about Mr. Black's alleged racial animus (such that they might be cognizable under § 1981, *CBOCS*, 553 U.S. at 452, or perhaps under § 1983's guarantee of Equal Protection), or whether the references were given in retaliation for Pride's complaints about Denver's delay in implementing the long-term contract (such that they might be cognizable as claims of retaliation for the exercise of First Amendment rights under § 1983), or through some other theory. In either event, there are additional concerns as to the ability of the current Complaint to state any retaliation-based claim, including what appears to be a remote temporal proximity between Pride's 2007 complaints to Denver and the giving of adverse references in 2010 and 2011 and the lack of any clear theory of Denver's municipal liability for references that may have been given. Rather than attempting to address those issues on the vague statements in the Complaint, the Court finds that dismissal of any alleged retaliation claims under *Iqbal*, accompanied by leave to replead, is appropriate.

Accordingly, the Court dismisses Pride's alleged retaliation claims as currently pled for failure to state a claim. Pride may, within 21 days of this Order, file an Amended Complaint alleging only claims premised upon the alleged adverse references.

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motions to Dismiss (**# 13, 15**) are **GRANTED**, and the claims in the Complaint are **DISMISSED**. As set forth above, within 21

days, Pride may file an Amended Complaint that adequately pleads any claims it may have arising out of the alleged giving of adverse references. If no such Amended Complaint is filed within the 21-day period, the Clerk shall close this case.

Dated this 21st day of September, 2012

BY THE COURT:

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
United States District Judge